**SINCLAIR TRANSPORTATION COMPANY, d/b/a Sinclair Pipeline Company, a Wyoming corporation, Petitioner–Appellee,**

v.

**Lauren SANDBERG, Kay F. Sandberg, Ivar E. Larson, and Donna M. Larson, Respondents–Appellants.**

No. 08CA1249.

Colorado Court of Appeals, Div. VI.

Sept. 17, 2009.

Rehearing Denied Oct. 22, 2009.

Faegre & Benson, LLP, John R. Sperber, Brandee L. Caswell, Denver, Colorado, for Petitioner–Appellee.

Dean & Reid, LLC, Daniel W. Dean, Fort Collins, Colorado, for Respondents–Appellants.

Opinion by Judge HAWTHORNE.

In this condemnation action, respondents, Lauren and Kay F. Sandberg and Ivar E. and Donna M. Larson (collectively, landowners), appeal the trial court's order granting petitioner, Sinclair Transportation Company (STC), immediate possession of landowners' properties and its judgment determining the properties' values. We affirm.

## I. Facts and Procedural Background

In January 2006, STC, a Wyoming corporation, requested landowners to amend a 1963 easement over landowners' properties in Weld County to allow STC to install within the easement a ten-inch pipeline adjacent to a previously installed six-inch petroleum pipeline. The 1963 easement is fifty feet wide and encumbers approximately 1.04 acres of the Sandbergs' property and 1.75 acres of the Larsons' property.

STC requested the amendment to allow it to supplement the amount of refined petroleum motor fuels it transports by the six-inch pipeline from Sinclair, Wyoming to a distribution terminal in Henderson, Colorado. At the distribution terminal, STC receives, stores, and loads the fuel onto trucks for distribution to wholesalers and customers in the Denver metropolitan area, Nebraska, Wyoming, New Mexico, and Utah.

After negotiations, STC and landowners failed to reach an agreement, and STC initiated condemnation proceedings. At the immediate possession hearing, the trial court found that STC proved by a preponderance of the evidence that it was entitled to immediate possession of landowners' properties. Following a subsequent valuation hearing, the court awarded landowners compensation for their properties in the amounts estimated by STC's appraiser. Landowners now appeal the court's order granting immediate possession and its judgment based on the evidentiary and valuation rulings.

## II. Power of Eminent Domain

Landowners contend that the trial court erred by finding that STC has legal authority to condemn landowners' properties because STC does not qualify as an entity granted the power of eminent domain under either section 38–4–102 or section 38–5–105, C.R.S. 2009. We disagree.

### A. Standard of Review

■ In cases involving condemnation proceedings, we review the trial court's factual findings for clear error and review its legal conclusions de novo. *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo.2000).

### B. Analysis

Private property may not be condemned by a private entity unless there exists express, or necessarily implied, statutory authority to condemn. Colo. Const. art. II, § 15; *Buck v. Dist. Court*, 199 Colo. 344, 347, 608 P.2d 350, 352 (1980); *Dep't of Health v. Hecla Mining Co.*, 781 P.2d 122, 125 (Colo. App.1989).

Here, STC's condemnation petition asserts that both section 38–4–102 and section 38–5–105 grant it the power of eminent domain as a foreign pipeline company. Following the immediate possession hearing, the court entered a written order reiterating its ruling made during the hearing that "STC has the legal authority to condemn [landowners' properties]." Even though the court did not cite the legal authority on which it relied, we infer that it relied on section 38–5–105 be-

cause it announced its ruling during the hearing shortly after STC argued that it is granted the power of eminent domain under section 38–5–105. Therefore, we begin our analysis with that section.

### 1. Section 38–5–105

 When construing a statute, our primary duty is to ascertain and give effect to the legislature's intent, looking first to the statute's plain language. *McIntire v. Trammell Crow, Inc.,* 172 P.3d 977, 979 (Colo.App. 2007). If the statute's plain language is clear and unambiguous, we apply the statute as written. *Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.,* 95 P.3d 571, 591 (Colo. 2004).

 As pertinent here, section 38–5–105 provides:

> Such ... pipeline company ... is vested with the power of eminent domain, and authorized to proceed to obtain rights-of-way for poles, wires, pipes, regulator stations, substations, and systems for such purposes by means thereof. Whenever such company ... is unable to secure by deed, contract, or agreement such rights-of-way, or easements of persons or corporations, it shall be lawful for such ... pipeline company ... to acquire such title in the manner now provided by law for the exercise of the right of eminent domain and in the manner as set forth in this article.

The phrase "[s]uch ... pipeline company" in this section necessarily means, as relevant here, by reference back to section 38–5–101, C.R.S.2009, "[a]ny domestic or foreign ... pipeline company ... authorized to do business under the laws of this state." *See Reg'l Transp. Dist. v. Aurora Pub. Schs.,* 45 P.3d 781, 783 (Colo.App.2001) (use of "the" as article introducing "vehicle designed to transport seven or more passengers" in repealed Colorado statute referred back to the previously specified entity, "a public school vehicle designed to transport seven or more passengers" in that same statute).

Here, STC claims that section 38–5–105 grants it the power of eminent domain because it is a foreign pipeline company author-

ized to do business in Colorado. However, landowners correctly observe that neither section 38–5–105 nor any other section in Article 5 defines "pipeline company." Therefore, we address whether STC is a pipeline company as that term is contemplated by section 38–5–105.

 Because no Colorado statute or case law defines "pipeline company" as it is used in section 38–5–105, we look to the words' plain and ordinary meanings and other jurisdictions' instructive decisions. *See People v. Swain,* 959 P.2d 426, 432 (Colo.1998) (where statute does not define "driving," court looks to plain and ordinary meaning); *see also In re Marriage of Ciesluk,* 113 P.3d 135, 142 (Colo.2005) (when case presents issue of law of first impression, we may look to other jurisdictions' instructive decisions).

*Webster's Third New International Dictionary* 1722 (2002) defines "pipeline" as "a line of pipe connected to pumps, valves, and control devices for conveying liquids, gases, or finely divided solids." "Company" is defined as "an association of persons for carrying on a commercial or industrial enterprise or business." *Id.* at 461.

The following statutory provisions and case law also inform our analysis as to a pipeline company's functions and the substances one commonly conveys:

1. Section 7–43–102, C.R.S.2009, contemplates that pipeline companies are corporations formed "for the purpose of *constructing* a pipeline for the conveyance of *gas, water, or oil.*" (Emphasis added.)

2. In the context of "Rights–of–Way: Designated Common Carriers," section 38–4–102 provides that a pipeline company is "[a]ny foreign or domestic corporation organized or chartered for the purpose, among other things, of *conducting or maintaining* a pipeline for the transmission of *power, water, air, or gas.*" (Emphasis added.)

3. In *Larson v. Chase Pipe Line Co.,* 183 Colo. 76, 79, 514 P.2d 1316, 1317 (1973), our supreme court, without identifying the substance(s) conveyed, determined that a Kansas corporation, authorized to do business in Colorado, that *financed* and would *operate* a proposed pipeline in Colorado was a proper

entity under the precursor statute to 38–5–105 to bring a condemnation action to obtain a right-of-way across private property.

4. Other jurisdictions define a pipeline company as one conveying, in addition to power, air, gas, water, and oil, other products, including steam, natural gas, processed gas, manufactured gas, crude oil, refined petroleum products, coal, and related products. *See Watergate Improvement Assocs. v. Pub. Serv. Comm'n,* 326 A.2d 778, 785 (D.C.1974) ("pipeline company" "includes every corporation ... owning, operating, managing, or controlling the supply of liquid, steam, or air through pipes or tubing to consumers for use or for lighting, heating, or cooling purposes, or for power" (quoting D.C.Code § 43–121)); *see also* 49 U.S.C. § 60101(a)(4)(a), (a)(7) (defining "hazardous liquid" as "petroleum or a petroleum product" and "interstate hazardous liquid pipeline facility" as "hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce"); *ANR Pipeline Co. v. Louisiana Tax Comm'n,* 997 So.2d 92, 95 n. 2 (La.Ct. App.2008) (" 'Pipeline company' means any company that is engaged primarily in the business of transporting oil, natural gas, petroleum products, or other products within, through, into, or from this state...." (quoting La.Rev.Stat. Ann. § 47:1851)); *Phillips Natural Gas Co. v. State,* 402 N.W.2d 906, 908 (N.D.1987) (" '[p]ipeline company' means a company owning, holding, or operating under a lease or otherwise, any property in this state for the purpose of transporting crude oil, natural gas, processed gas, manufactured gas, refined petroleum products, or coal and related products for public use" (quoting N.D. Cent.Code § 57–06–02(3))); *Columbia Gas Transmission Corp. v. Levin,* 117 Ohio St.3d 122, 882 N.E.2d 400, 406 (2008) (a person includes a pipeline company "transporting natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partially within this state" (quoting Ohio Rev.Code Ann. § 5727.01(D)(5))); *Columbia Gas Transmission Corp. v. State Corp. Comm'n,* 243 Va. 301, 414 S.E.2d 827, 829 (1992) ("pipeline distribution company" is "a corporation ... which transmits, by means of a pipeline, natural gas, manufactured gas or crude petroleum and the products or by-products thereof to a purchaser for the purposes of furnishing heat" and "pipeline transmission company" is "a corporation authorized to transmit natural gas, manufactured gas or crude petroleum and the products or by-products thereof in the public service by means of a pipeline or pipelines from one point to another" (quoting Va.Code Ann. § 58.1–2660)).

Here, because it is undisputed that STC (1) is a foreign corporation, in good standing and authorized to do business in Colorado; (2) operates and maintains the six-inch pipeline on landowners' properties; (3) conveys petroleum products through its pipelines; and (4) would be responsible for the construction, cost, operation, and maintenance of the ten-inch pipeline, we conclude that STC is a pipeline company for the purposes of section 38–5–105.

Therefore, the trial court did not err in determining that STC is a pipeline company under section 38–5–105 with the power of eminent domain and the authority to condemn landowners' properties. *See Larson,* 183 Colo. at 79, 514 P.2d at 1317.

Landowners' argument that section 38–5–105 "is meaningless" if the term pipeline company is not defined by reference to section 7–43–102 does not dissuade us from this conclusion.

### 2. Section 7–43–102

Section 7–43–102 provides that pipeline companies formed pursuant to its requirements may acquire, in the manner provided by law, title to any real estate required for the purpose of such company

> [w]henever any three or more persons associate under the provisions of law to *form* a corporation for the purpose of constructing a pipeline for the conveyance of gas, water, or oil, they, in the articles of incorporation ... shall state the places from and to which it is intended to construct the proposed line.

(Emphasis added.)

Here, the trial court found "that section 7–43–102 is not the basis upon which to deny the authority [to condemn] because ... [STC

is] a foreign corporation that has been authorized to do business in the State of Colorado, and that it is in good standing."

Although landowners concede that "foreign corporations are given authority [to condemn] by section 38–5–105," they argue on appeal that STC cannot exercise that authority because it is not a pipeline company as defined in section 7–43–102. Specifically, they argue that STC (1) was not formed for the purpose of constructing a pipeline, (2) did not file a map of the intended route for the pipeline, (3) is not a domestic company, and (4) did not produce evidence it was formed by three or more individuals. We are not persuaded by these arguments and instead agree with the trial court.

Landowners do not provide any authority to support their proposition that a foreign corporation is not a pipeline company as contemplated by section 38–5–105 unless it complies with the domestic pipeline company formation requirements of section 7–43–102. *See Biel v. Alcott,* 876 P.2d 60, 64 (Colo.App. 1993) (appealing party bears burden to provide supporting authority for contentions on appeal, and failure to do so will result in affirmation of judgment). We also note that section 7–43–102 does not require that a pipeline company file a map of the intended route for its proposed pipeline. *See* § 7–43–102.

Moreover, we do not construe section 7–43–102 to define a pipeline company. Rather, the plain language of section 7–43–102 indicates that the legislature intended to describe the process by which "[a]ny [domestic] pipeline corporation [shall be] *formed* under the provisions of [Colorado] law." If we were to construe section 7–43–102 as exclusively defining a pipeline company in Colorado, such a company would be able to engage only in constructing pipelines. However, at least one other Colorado statute contemplates other functions of pipeline companies. *See* § 38–4–102 (provides that pipeline companies may also *conduct* or *maintain* pipelines for transmitting specified products through pipelines); *see also People v. Thoro Products Co.,* 45 P.3d 737, 741 (Colo.App. 2001) ("[i]n interpreting statutes, we must construe each statutory provision in harmony with the overall statutory scheme," and "we must also avoid statutory constructions that lead to absurd results"), *aff'd,* 70 P.3d 1188 (Colo.2003).

Further, at the immediate possession hearing, landowners offered and the trial court admitted STC's articles of incorporation and its Colorado statement of foreign entity authority, which demonstrate that STC is lawfully incorporated in Wyoming under the Wyoming Business Corporation Act and authorized to do business in Colorado as a foreign entity. In addition, STC presented a certificate from Colorado's secretary of state assigning it an entity identification number and declaring in part that "[STC] is an entity *formed* or registered under the law of Wyoming [and] has complied with all applicable requirements of this office, and is in good standing with this office." (Emphasis added.)

With regard to foreign entities such as STC that are authorized to transact business or conduct activities in Colorado, section 7–90–805(3), C.R.S.2009, provides in part: "Nothing in this part 8 authorizes [Colorado] to regulate the ... *formation* ... of a foreign entity authorized to transact business or conduct activities in [Colorado]." (Emphasis added.)

Because Colorado cannot dictate or regulate how a foreign entity is formed, STC is not subject to the pipeline company formation requirements in section 7–43–102. *See also Cooper Mfg. Co. v. Ferguson,* 113 U.S. 727, 734, 5 S.Ct. 739, 28 L.Ed. 1137 (1885) (state act providing for formation of corporations cannot be construed to impose upon foreign corporation limitations of right to carry on commerce between the states; to do so would invade Congress's exclusive right to regulate commerce between states). Thus, landowners' reliance on section 7–43–102 is misplaced.

Section 7–43–102 is but one of multiple Colorado statutes authorizing oil and gas pipeline companies to acquire rights-of-way, and such authority granted under this section does not eliminate the grants of authority to acquire rights-of-way provided by other statutes. *See* §§ 38–1–101.5, 38–2–101, 38–

4–102, 38–5–104, 38–5–105, C.R.S.2009; *see also Akin v. Four Corners Encampment,* 179 P.3d 139, 145 (Colo.App.2007) ("[s]everal Colorado statutes permit oil and gas pipeline companies to condemn private property for a variety of uses"); *see generally* § 38–1–201(2)(c), C.R.S.2009 (legislative declaration acknowledging that current laws authorizing exercise of the power of eminent domain make it difficult to determine what entities possess the power of eminent domain in a given situation); *Town of Parker v. Norton,* 939 P.2d 535 (Colo.App.1997).

Therefore, we are not persuaded by landowners' argument that "section 38–5–105 is meaningless if the term pipeline company is not defined by reference to section 7–43–102."

Because section 38–5–105 grants STC the power of eminent domain, we need not address landowners' argument that STC is not granted the power of eminent domain under section 38–4–102. *See Akin,* 179 P.3d at 145; *see also Town of Parker v. Norton,* 939 P.2d at 537 (statute prohibiting right of eminent domain had no effect on right of eminent domain granted under independent legal authority).

### III. Public Purpose

Landowners argue that the court erred when it determined that STC's transmission of refined petroleum motor fuels through the proposed ten-inch pipeline would serve a public purpose because (1) STC's refined petroleum product is not necessary to develop a resource in Colorado, (2) STC is not a common carrier, and (3) public purpose considerations include safety issues, and the court specifically excluded consideration of safety issues.

■■■ Condemnation is only permitted if the reason for which condemnation is sought is judicially determined to be for a public use. Colo. Const. art. II, § 15; *Sheridan Redev. Agency v. Knightsbridge Land Co.,* 166 P.3d 259, 265 (Colo.App.2007). In examining the stated public purpose, appellate courts look to whether it is supported by the record, and if so, our inquiry ends. *See Sheridan Redev. Agency,* 166 P.3d at 265.

Initially, we note the difference between the terms "public purpose" and "public use." In their briefs, landowners refer to "public purpose" and "public use" interchangeably. These are two distinct terms that require different legal tests, and in a condemnation action, we apply the public purpose test. *See Bd. of County Comm'rs v. Kobobel,* 176 P.3d 860, 863 (Colo.App.2007) (U.S. Supreme Court rejected public use and adopted public purpose test at end of nineteenth century, and Colorado adopted public purpose for condemnation cases in middle of twentieth century); *Rabinoff v. Dist. Court,* 145 Colo. 225, 232–37, 360 P.2d 114, 118–21 (1961). Therefore, we do not address landowners' arguments that refer to public use.

■■■ The public purpose test requires that the overall objective of the project serve a public benefit. *Kelo v. City of New London,* 545 U.S. 469, 480, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005); *Kobobel,* 176 P.3d at 863. A public purpose must be determined on a case-by-case basis because a precise definition does not exist. *Kobobel,* 176 P.3d at 863. Colorado courts consider (1) the land's physical conditions, (2) the community's needs, (3) the character of the benefit conferred on the community, and (4) the improvement's necessity in developing the state's resources. *Id.* Standing alone, the fact that a private interest may benefit from the condemnation does not defeat a public purpose. *Id.* A court must determine whether the condemnation's essential purpose is to obtain a public benefit. *Id.* The condemning authority must demonstrate public purpose by a preponderance of the evidence. *See* § 38–1–101(2)(b), C.R.S. 2009.

■■■ Here, the trial court's finding that "acquisition of [landowners'] properties serves a public purpose" was based on STC's general counsel's testimony that "the [ten-inch] pipeline was necessary to provide an adequate supply of oil products to meet the increased demand of the customers in the greater Denver metropolitan area." The court further concluded that "the fact that [STC] distributes its products to approximately 203 customers in the Denver area does not defeat a public purpose or necessity."

In addition, STC's general counsel also testified that the ten-inch pipeline would "create a redundancy ... so that when the existing pipeline goes out of service for inspections or repairs, [STC will] still have the ability to transport product to the Denver market." STC also presented evidence that its existing six-inch pipeline provides fuel to Nebraska, Wyoming, New Mexico, and Utah. Thus, evidence in the record indicates that the ten-inch pipeline would permit continuous service to STC's existing Colorado customers as well as out-of-state customers.

Landowners argue that no evidence showed a benefit conferred on the local Weld County community. However, they do not cite authority, and we are not aware of any, that requires a condemnation to serve a public purpose for the benefit of one community over another.

We conclude that the trial court's finding that STC's ten-inch pipeline would serve a public purpose is supported by evidence in the record.

We need not address landowners' argument that STC is not a common carrier because it is not relevant to our resolution of this issue. In addition, we do not address landowners' arguments concerning STC's proposed amendment to the existing easement or consideration of safety issues as either argument relates to public purpose, because landowners do not cite to any authority supporting those arguments. *See Biel*, 876 P.2d at 64.

### IV. Good Faith Negotiations

Landowners contend that, although STC communicated that it would compensate landowners in exchange for an amendment to its 1963 easement, STC did not engage in good faith negotiations. We disagree.

 Condemnation is only appropriate if "the compensation to be paid for, in respect of property sought to be appropriated ... cannot be agreed upon by the parties interested." § 38–1–102(1), C.R.S.2009. This good faith negotiation requirement is satisfied where the condemning authority makes a reasonable good faith offer to reach an agreement with the property owner and al-

lows the owner sufficient time to respond. *Sheridan Redev. Agency*, 166 P.3d at 266. Lengthy or face-to-face negotiations are not required. *Id.* Thus, a condemnation action may commence where "the property owner remains silent or rejects the offer without making an acceptable counteroffer," *id.*, and the condemning authority establishes that negotiations with the landowners would have been futile. *Bd. of County of Comm'rs v. Blosser*, 844 P.2d 1237, 1239 (Colo.App.1992).

 Here, beginning with a letter sent in January 2006, STC initiated communication with landowners offering them compensation in exchange for an amendment to the existing easement. STC subsequently sent eight more letters to landowners, with the last letter dated April 6, 2007 and entitled, "Final Offer to Purchase."

Several of these letters offered to pay landowners compensation amounts above the appraised value of landowners' properties as "an inducement to the parties to reach an agreement." However, landowners did not accept STC's offers, and before receiving STC's final letter, countered its last offer.

Landowners countered that (1) it was mandatory that the six-inch pipeline be relocated and the ten-inch pipeline be installed on the properties' west boundary line, adjacent to an existing Xcel Energy easement, (2) they would pay up to one-half of the costs for relocating the six-inch pipeline, (3) safety and setback issues had to be resolved, and (4) they required compensation exceeding $600,000, a figure significantly above the compensation amount STC had offered.

The trial court found,

Based on the exhibits received into evidence and the testimony of [an STC witness], [STC] made reasonable and good faith offers to the [landowners].... Good faith negotiations were conducted for the acquisition of [landowners' properties] and further negotiations would have been futile.

We conclude that the record supports the trial court's determination because (1) STC made several offers, some of which exceeded the properties' appraised values, (2) landowners did not accept the offers, although they

had a reasonable time to do so, and (3) landowners' counteroffer demanded substantially more than STC's offers and the properties' appraised values. *See generally Sheridan Redev. Agency*, 166 P.3d at 266–67 (good faith negotiation requirement under section 38–1–102(1) was satisfied because (1) petitioner made two separate offers, both of which exceeded appraisal, (2) landowners were afforded reasonable time to accept petitioner's offers, but declined to do so, and (3) landowners' only counteroffer was substantially greater than either of petitioner's offers and the only appraisal).

## V. Route Selection and Evidence of Safety

Landowners appear to argue that the trial court erred in finding that the most direct and practicable route for the new pipeline was through the existing 1963 easement because the court failed to consider evidence relating to safety issues. We disagree.

■ A trial court has considerable discretion in deciding the admissibility of evidence, and abuse of that discretion occurs only when its ruling is manifestly arbitrary, unreasonable, or unfair. *See Martin v. Union Pacific R.R. Co.*, 186 P.3d 61, 68 (Colo.App.2007), *rev'd on other grounds*, 209 P.3d 185 (Colo. 2009); *see also City of Aurora ex rel. Utility Enterprise v. Colorado State Eng'r*, 105 P.3d 595, 610 (Colo.2005) (trial courts have wide latitude to accept or refuse evidence).

Landowners rely on section 38–1–101.5, C.R.S.2009, entitled "Necessity of taking land for pipelines," which provides, in part:

(1) When a court is determining the necessity of taking private land or nonfederal public land for the installation of a pipeline, the court shall require the pipeline company;

(a) To show that the particular land lies within a route which is the most direct route practicable;

. . .

(c) To consider existing utility rights-of-way before any new routes are taken if the land to be condemned is adjacent to existing utility rights-of-way.

■ Landowners repeatedly urged the trial court, and argue on appeal, that safety should be considered in determining the ten-inch pipeline's location, their properties' values, and other issues. However, landowners did not cite to the trial court, and do not cite on appeal, any authority that supports the proposition that a court must consider safety issues in pipeline condemnation cases. *See Biel*, 876 P.2d at 64 (appealing party bears burden to provide supporting authority for contentions on appeal, and failure to do so will result in affirmation of judgment). Therefore, we conclude that the court did not abuse its discretion in excluding such evidence, and we do not address landowners' remaining arguments concerning "safety [as] a factor" in these proceedings. *See id.*

## VI. Valuation Methodology

Landowners contend that the court abused its discretion when it excluded their proffered testimony at the valuation hearing concerning their valuation methodologies. We disagree.

### A. Standard of Review

We review a trial court's ruling regarding evidence admissibility under an abuse of discretion standard, and we will not disturb its ruling unless it is manifestly arbitrary, unreasonable, or unfair. *Hall v. Frankel*, 190 P.3d 852, 858 (Colo.App.2008).

### B. Analysis

■ Where a dispute concerning the right to condemn is no longer present, the remaining issue to be resolved is the property's fair market value at the date of trial. *Dillinger v. North Sterling Irrigation Dist.*, 135 Colo. 95, 98, 308 P.2d 606, 608 (1957). At the valuation stage of a condemnation case, the landowner may testify to his or her own opinion estimating his or her land's value. *Baker Metro. Water & Sanitation Dist. v. Baca*, 138 Colo. 239, 241, 331 P.2d 511, 512 (1958). However, the landowner's opinion is not admissible if it is based upon improper considerations. *Denver Urban Renewal Auth. v. Hayutin*, 40 Colo.App. 559, 563, 583 P.2d 296, 299–300 (1978).

■ Here, the trial court excluded landowners' intended testimony that was to be

based on an income capitalization approach focused on future residential development and estimating the number of lots created, the estimated profits to the developer and contractor for construction and home sales, minus the lots that would be lost due to alleged safety concerns and need for set-backs. While the valuation evidence may include a probable future change in land use restrictions, a totally speculative or conjectural prediction of the property's future use may not be used in determining the property's present value. *Fowler Irrevocable Trust 1992–1 v. City of Boulder,* 17 P.3d 797, 803 (Colo.2001). Here, the trial court determined that landowners' income capitalization approach was speculative conjecture or an estimate of future use that was not reflected in the properties' present value, and we agree.

In addition, the trial court excluded landowners' evidence concerning an alleged comparable property sale to AIMS Community College. A party may present comparable sale evidence so long as the sale is similar in locality and character to the land being taken and the sale and condemnation are in close temporal proximity. *Bd. of County Comm'rs. v. Vail Assocs., Ltd.,* 171 Colo. 381, 389–90, 468 P.2d 842, 846 (1970). Here, the court determined that the property sold to AIMS was not similar in locality and character to landowners' properties because of (1) discrepancy in size, (2) dissimilar proximity to a major highway, and (3) dissimilar future property uses. These findings are supported by the record.

Therefore, we perceive no abuse of the court's discretion in excluding this testimony.

### VII. Unconstitutional Taking

Landowners contend that the trial court's ruling excluding "all meaningful evidence available to landowners" from the valuation hearing required the court to enter a directed verdict that would logically "result in an unconstitutional taking without just compensation." We disagree.

■ In a condemnation proceeding, the just compensation to be paid for the private property taken by the condemnor "shall be ascertained by a board of commissioners, of not less than three freeholders, or by a jury, when required by the owner of the property." Colo. Const. art. II, § 15; *see City of Westminster v. Hart,* 928 P.2d 758, 760 (Colo. App.1996). The burden rests on the landowner to show by a preponderance of the evidence the property's present actual cash value. *Bd. of Comm'rs v. Noble,* 117 Colo. 77, 79–80, 184 P.2d 142, 143 (1947).

### A. Compensation Determined by Jury

■ Landowners argue that they were denied their constitutional right to have just compensation determined by a jury of freeholders. However, the record shows landowners waived that right. *See Fifth Church of Christ, Scientist v. W.F. Pigg & Son, Inc.,* 109 Colo. 103, 106, 122 P.2d 887, 888 (1942) (persons may effectively waive by act or omission a constitutional right to which they would otherwise be entitled).

Here, STC presented testimony from a qualified expert appraiser at the immediate possession hearing. STC's expert appraiser testified that landowners' properties' highest and best use would be for future residential development, and both parties stipulated to his conclusion that the properties' value was $37,000 per acre. Based on these factors, STC's expert appraiser testified that the estimated fair market value of the properties that STC would encumber to install its ten-inch pipeline was $9,620 for the Sandbergs' parcel and $16,197 for the Larsons' parcel.

The court granted STC's unopposed motion to set its deposits at $14,620 and $26,197 for the Sandbergs' and Larsons' properties, respectively, which comprised STC's expert appraiser's fair market valuations and the court's estimated property restoration costs. *See Swift v. Smith,* 119 Colo. 126, 138, 201 P.2d 609, 615 (1948) ("[t]he sum fixed by the court on entering an order for immediate possession should be equal to an amount which ... will reimburse [landowners] for all damages and pay the compensation which is to be allowed to the [landowners] when ascertained by a board of commissioners or jury").

Prior to the valuation hearing, the court granted STC's motions in limine requesting

that it exclude landowners' opinions of their properties' values based on the improper valuation methodology and evidence landowners intended to use. Despite the court's in limine orders, landowners offered the same valuation evidence at the valuation hearing. Again, the court excluded it. Landowners conceded they had no evidence to present that was based on legally accepted valuation methods.

Because landowners did not submit any admissible evidence at the valuation hearing, and therefore, could not carry their burden of proving the just compensation amount to which they were entitled, STC moved for a directed verdict. Landowners stated that "based on the rulings on the admissibility of the evidence offered, [the court had] no choice but to direct a verdict in favor of petitioners, but that's zero dollars."

After the court directed a verdict in STC's favor, and before the just compensation to which landowners were entitled was determined, the court asked if the parties agreed to sending the jury home. Landowners replied that they had "[n]o disagreement."

Having agreed to entry of the directed verdict and to dismiss the jury before any valuation evidence could be considered by it, landowners waived their constitutional right to have a jury determine just compensation for their properties. *Johnson v. Neel*, 123 Colo. 377, 388, 229 P.2d 939, 944 (1951) (under doctrine of equitable estoppel, constitutional rights may be effectively waived by conduct consisting of action or failure to act); *see Fifth Church of Christ*, 109 Colo. at 106, 122 P.2d at 888 (party's effective waiver of constitutional right, by act or omission, "is nothing more than the equitable doctrine of estoppel applied in the realm of constitutional law and is uniformly upheld in cases where the constitutional provision is solely protective of property rights") (quoting *Wilson v. Sch. Dist.*, 328 Pa. 225, 244, 195 A. 90, 100 (1937)).

Despite having waived their right to a jury trial, landowners are entitled to just compensation for their properties. *See* Colo. Const.

art. II, § 15; *Hart*, 928 P.2d at 760. Relying on STC's offer of proof at the valuation hearing, the court determined the just compensation amounts for the Sandbergs' and Larsons' properties to be $9,620 and $16,197, respectively.[1] Landowners do not dispute that if STC's methodology were adopted, these amounts would be proper.

## B. Right to Confront Evidence

■■■ Landowners also argue that they "were denied their constitutional right[ ] to confront the evidence." We do not address this argument because landowners do not cite any authority supporting their assertion that they have a constitutional right to confront the evidence in an eminent domain proceeding, nor do they develop their argument by explaining how an opportunity to confront evidence would have led to a different amount of just compensation. *See Biel*, 876 P.2d at .64 (appealing party bears burden to provide supporting authority); *People in Interest of D.B–J.*, 89 P.3d 530, 531 (Colo. App.2004) (declining to address issue lacking reference to supporting legal authorities); *People v. Simpson*, 93 P.3d 551, 555 (Colo. App.2003) (appellate court declined to consider presented legal proposition because party failed to develop argument); *Westrac, Inc. v. Walker Field*, 812 P.2d 714, 718 (Colo.App. 1991) ("[i]t is the duty of counsel to inform the court both as to specific errors relied upon and as to the grounds, supporting facts, and authorities therefor").

Therefore, we conclude that landowners' properties were not unconstitutionally taken without just compensation because the trial court awarded the Sandbergs $9,620 and the Larsons $16,197, as just compensation for their properties, and the record supports compensation in these amounts.

## VIII. Project Influence Rule

■■■ Landowners contend that the trial court erred in determining the just compensation due them because the court relied on STC's appraisal, which violated the project

---

1. STC's offer of proof indicated that the properties had already been restored to their original condition. Therefore, the only issue remaining to be decided was the amount of just compensation for the properties.

influence rule. We do not address this contention.

Although landowners objected, in prevaluation hearing proceedings, to STC's proposed jury instruction regarding the method of calculating just compensation because it allegedly violated the project influence rule, they subsequently requested that the court enter directed verdicts in the amount of zero dollars. In addition, landowners did not alternatively argue that if the court relied on STC's offer of proof in determining just compensation, its property value calculations violated the project influence rule. Thus, because landowners did not seek or obtain a ruling from the trial court on this issue, we need not address it. *See People v. Cevallos–Acosta,* 140 P.3d 116, 122 (Colo.App.2005) (issue not preserved for appeal where party fails to seek or obtain trial court's ruling on the issue).

## IX. Conclusion

The trial court's immediate possession order and its judgment awarding just compensation are affirmed.

Judge CARPARELLI and Judge TERRY concur.