2012 CO 36

**Ivar E. LARSON, Donna M. Larson, Lauren Sandberg and Kay F. Sandberg, Petitioners**

v.

**SINCLAIR TRANSPORTATION COMPANY, d/b/a Sinclair Pipeline Company, a Wyoming corporation, Respondent.**

No. 09SC966.

Supreme Court of Colorado,
En Banc.

May 21, 2012.

Rehearing Denied Sept. 10, 2012.

Polsinelli Shughart PC, Bennett L. Cohen, Denver, CO, Dean & Reid, LLC, Daniel W. Dean, Fort Collins, CO, for Petitioners.

Faegre Baker Daniels LLP, John R. Sperber, Brandee L. Caswell, Sarah Mastalir Kellner, Denver, CO, for Respondent.

Beatty & Wozniak, P.C., Kenneth A. Wonstolen, Jamie L. Jost, William E. Sparks, Denver, CO, for Amici Curiae the Colorado Oil & Gas Association and the Colorado Petroleum Association.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this eminent domain action, we address whether section 38–5–105, C.R.S. (2011), grants condemnation authority to a company for the construction of a petroleum pipeline. We conclude that the General Assembly did not grant, expressly or by clear implication, the power of eminent domain to companies for the construction of pipelines conveying petroleum. Section 38–5–105 therefore does not grant condemnation authority to Sinclair Transportation Company (Sinclair) for the purpose of constructing its pipeline. Accordingly, we reverse the court of appeals' opinion upholding the trial court's order granting Sinclair immediate possession of the subject property.

## I. Facts and Procedural History

¶ 2 Since 1963, Sinclair and its predecessors have owned right-of-way easements across two properties, one property now owned by Ivar E. Larson and Donna M. Larson and another property now owned by Lauren Sandberg and Kay F. Sandberg (collectively, landowners). The easements allow Sinclair to run a single six-inch gasoline pipeline underground across the properties. In 2006, Sinclair approached the landowners to negotiate for new easements, adjacent to the existing easements, so that it could run a second underground gasoline pipeline parallel to the first pipeline. The parties did not reach an agreement and Sinclair petitioned the trial court for immediate possession of the desired property rights.

¶ 3 The trial court determined that Sinclair had authority to condemn the property pursuant to section 38–5–105. The trial court granted the petition for immediate posses-

sion and held a valuation hearing to determine the market value of the condemned property. At the hearing, the trial court refused to admit almost all of the landowners' evidence on valuation and granted a directed verdict in favor of Sinclair.

¶ 4 The landowners appealed and the court of appeals affirmed. The court of appeals concluded that Sinclair had authority to condemn the property pursuant to section 38–5–105 because it is a "pipeline company." *Sinclair Transp. Co. v. Sandberg*, 228 P.3d 198, 204 (Colo.App.2009). It also concluded that the trial court did not abuse its discretion by refusing to admit the landowners' valuation evidence and directing a verdict in favor of Sinclair. *Id.* at 208–11.

¶ 5 We granted certiorari to review the court of appeals' determination of condemnation authority and also its determination of other claimed errors during the proceedings.[1]

## II. Analysis

¶ 6 We conclude that section 38–5–105 does not grant condemnation authority, either expressly or by clear implication, to companies for the construction of a petroleum pipeline. Rather, the General Assembly intended to authorize condemnation for the construction of electric power infrastructure.

### A. Standard of Review

■ ¶ 7 The eminent domain issue in this case presents a question of statutory interpretation. We review de novo the court of appeals' interpretation of a statute. *Boulder Cnty. Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo.2011).

■ ¶ 8 Our primary task when interpreting a statute is to give effect to the

1. Specifically, we granted certiorari on the following issues:
   1. Whether the court of appeals erred in concluding that section 38–5–105, C.R.S., grants Sinclair Transportation Company the power of eminent domain.
   2. Whether the court of appeals erred in concluding that potential safety issues and regulations need not be considered when determining whether "the particular land lies within a route which is the most direct route practicable," under section 38–1–101.5, C.R.S.

3. Whether the court of appeals erred in affirming the trial court's ruling precluding landowners' proposed valuation testimony and related evidence because of their valuation methodology.
4. Whether the court of appeals erred in affirming the trial court's grant of directed verdict in favor of Sinclair Transportation Company on the amount of just compensation, dismissal of the jury, and determination of the just compensation amounts based on Sinclair's offer of proof.

44

intent of the General Assembly. *Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1190 (Colo.2010). We look first to the plain language of the statute, giving the language its commonly accepted and understood meaning. *Id.* Where the language is ambiguous, we look to the legislative history of the statute and the context of the overall statutory scheme to ascertain the legislature's intent. *Sperry v. Field,* 205 P.3d 365, 367 (Colo. 2009). We may also consider the title of the statute and any accompanying statement of legislative purpose. *People v. Cross,* 127 P.3d 71, 73 (Colo.2006); *Concerned Parents of Pueblo, Inc. v. Gilmore,* 47 P.3d 311, 313 (Colo.2002).

¶ 9 In addition, we construe narrowly statutes which confer condemnation power upon private entities. *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010) (citing *Coquina Oil Corp. v. Harry Kourlis Ranch,* 643 P.2d 519, 522 (Colo.1982)). We have stated, therefore, that condemnation authority, "being against the common right to own and keep property, must be given expressly or by clear implication; it can never be implied from doubtful language." *Coquina,* 643 P.2d at 522 (quoting *Town of Eaton v. Bouslog,* 133 Colo. 130, 131–32, 292 P.2d 343, 344 (1956)); *see also Potashnik v. Pub. Serv. Co. of Colo.,* 126 Colo. 98, 101, 247 P.2d 137, 138 (1952).

### B. Condemnation Authority

¶ 10 The court of appeals determined that, according to its plain language, section 38–5–105 grants eminent domain authority to any "pipeline company." *Sinclair,* 228 P.3d at 204. It then reasoned, based upon cases from other jurisdictions, that a "pipeline company" is a company that conveys "power, air, gas, water, ... oil, ... steam, natural gas, processed gas, manufactured gas, crude oil, refined petroleum products, coal, and related products" through a pipeline. *Id.* Because Sinclair conveys petroleum products through its pipelines, the court of appeals concluded that Sinclair is a pipeline company under section 38–5–105. *Id.* We disagree because section 38–5–105 does not expressly define a pipeline company as a company conveying petroleum, and nothing in Article 5 of Title 38 clearly implies such a definition.

¶ 11 Section 38–5–105 provides: "Such telegraph, telephone, electric light power, gas, or pipeline company or such city or town is vested with the power of eminent domain, and authorized to proceed to obtain rights-of-way for poles, wires, pipes, regulator stations, substations, and systems for such purposes by means thereof."

¶ 12 Reading Article 5 as a whole, the words "such ... company" in section 105 mean companies described in sections 38–5–101 and –102, C.R.S. (2011). Those sections describe these companies as: "Any domestic or foreign electric light power, gas, or pipeline company authorized to do business under the laws of this state." §§ 38–5–101, –102.

¶ 13 Section 105 also provides that these companies are authorized to obtain rights-of-way for certain physical installations "for such purposes." Just as "such ... companies" is more completely described in sections 101 and 102, we also look to those two sections for the meaning of the phrase "such purposes" in section 105. Section 101 provides:

Any domestic or foreign electric light power, gas, or pipeline company authorized to do business under the laws of this state or any city or town owning electric power producing or distribution facilities shall have the right *to construct, maintain, and operate lines of electric light, wire or power or pipeline ....*

(Emphasis added). Section 102 provides:

Any domestic or foreign electric light power, gas, or pipeline company authorized to do business under the laws of this state, or any city or town owning electric power producing or distribution facilities shall have the right *to construct, maintain, and operate lines of electric light wire or power or pipeline ....*

(Emphasis added).

¶ 14 None of these sections expressly authorizes a pipeline company to condemn property to construct, maintain, or operate a petroleum pipeline. In fact, neither the word petroleum nor the word oil is found anywhere in Article 5 of Title 38.

¶ 15 We therefore examine whether the General Assembly clearly implied that a company has condemnation authority under section 38–5–105 for the construction of a petroleum pipeline. The text of section 105, read in context with sections 101 and 102, provides that a "pipeline company" has authority to condemn rights of way for "pipes" in connection with certain purposes: the construction, maintenance, and operation of "lines of electric light, wire or power or pipeline," § 38–5–101, or "lines of electric light wire or power or pipeline," § 38–5–102. We find that this language is ambiguous because we cannot tell whether "electric light" modifies "pipeline."

¶ 16 Sinclair urges us to read the word "pipeline" as unmodified by the phrase "electric light." Under such a reading, the statute would provide that a "pipeline company" has authority to condemn rights of way for "pipes" in connection with the construction, maintenance, and operation of "lines of … pipeline." Such an interpretation would appear to grant authority to any pipeline company to condemn rights of way for a pipeline conveying *any substance.*

¶ 17 We, however, construe narrowly statutes which confer condemnation power upon private entities. *Bly*, 241 P.3d at 533. Moreover, the General Assembly has granted limited condemnation authority under other statutes to pipeline companies for the construction and maintenance of pipelines conveying *specific substances. See, e.g.,* § 38–4–102, C.R.S. (2011) (granting condemnation authority to certain corporations to conduct or maintain a pipeline "for the transmission of *power, water, air, or gas* ") (emphasis added); § 34–48–105, C.R.S. (2011) (granting condemnation authority to corporations to construct, maintain, or operate "pipeline for transporting *water or air* for mining purposes") (emphasis added); *see generally* § 38–1–202(2)(b), C.R.S. (2011) (listing all of the statutory provisions governing condemnation authority for pipeline companies conveying various specific substances or organized for specific purposes). If we were to

read section 38–5–105 as granting condemnation authority to any pipeline company for pipelines conveying *any substance,* these other limited grants of authority would be superfluous.[2] We therefore conclude that the General Assembly intended to limit condemnation authority in section 38–5–105 based on the substance to be conveyed by the pipeline. To ascertain this limit, we refer to the context of Article 5, to statements of legislative purpose, and to the history of the relevant statutes.

¶ 18 The court of appeals relied upon cases from foreign jurisdictions to conclude that limitations exist on the range of the permissible substances to be carried in the pipelines contemplated by section 38–5–105. *Sinclair,* 228 P.3d at 204. These cases interpreted the phrase "pipeline company" to include companies that convey petroleum, along with other natural resources. *Id.* But reliance upon foreign authorities merely highlights the fact that a construction of section 105 to include condemnation authority for petroleum pipelines requires additional guidance that the General Assembly did not provide. Such a grant of authority is therefore "implied from doubtful language," *see Coquina,* 643 P.2d at 522, and thus we reject the court of appeals' interpretation of the phrase "pipeline company."

¶ 19 Reading Article 5 as a whole, we conclude that the General Assembly intended to authorize eminent domain power for the construction of electric power infrastructure. The term "pipeline" therefore refers to pipes involved in delivering electric power through the power grid, such as those pipes encasing underground electric wiring. We reach this conclusion for several reasons. First, the placement of the comma in section 101 leads us to conclude that "electric" modifies "pipeline." The section thus applies only to electric pipelines. Second, sections 101 and 102 grant condemnation authority not only to the enumerated companies, but also to "any city or town owning electric power producing or distribution facilities." It appears from this

---

**2.** Sections 38–5–105 and 38–4–102 were each originally enacted in 1907. We cannot conclude that the General Assembly, in the same session, granted condemnation authority under section

38–4–102 to pipeline companies conveying only specific substances and also granted condemnation authority under section 38–5–105 for pipeline companies conveying any substance.

language that the General Assembly intended to grant condemnation authority to municipal bodies only in connection with electric power infrastructure. We perceive no reason why the General Assembly would grant private companies much broader condemnation authority than it granted municipal bodies under the same statutory scheme.

¶ 20 In addition, section 38–5–104, C.R.S. (2011), provides that condemnation authority conferred by section 105 "to such electric light power, gas, or pipeline companies" does not include the power to condemn a right of way across railroad company property, "except . . . to serve such railroad company with electric light, power, or gas service."[3] Section 104 therefore contemplates that these "pipeline companies" would be engaged in the conveyance of electric power or natural gas through their pipelines, not petroleum. Also, section 38–5–107, C.R.S. (2011), contains detailed provisions concerning high voltage electric power transmission, including discussion of "overhead or underneath construction." Section 107 is integral to the statutory scheme as a whole, and its provisions therefore support the determination that the statute as a whole concerns electric power infrastructure and does not govern transportation of petroleum.

¶ 21 Finally, Article 5 was originally enacted in its entirety in a 1907 act:

> to facilitate the construction of telegraph, telephone, electric light power and pipe lines, providing the right of eminent domain therefor, and defining the relation of persons or corporations seeking such rights of way to persons or corporations already owning such rights of way, including those owning or using and those seeking to own and use rights of way *for the transmission of electric or other power.*

Ch. 175, 1907 Colo. Sess. Laws 385, 385 (emphasis added). Since 1907, the provisions of Article 5 were only amended to remove references to telegraph and telephone service, to add references to natural gas transmission, and to provide for condemnation authority to municipal bodies. Ch. 75, secs.

2–6, §§ 38–5–101 to –108, 1996 Colo. Sess. Laws 298, 303–04 (removing references to telegraph and telephone and creating new statutory provisions, §§ 38–5.5–101 to –108, governing telecommunications rights-of-way); ch. 120, secs. 1–7, §§ 50–5–1 to –8, 1963 Colo. Sess. Laws 479, 479–82 (adding references to natural gas and municipal bodies). It is evident by the stated purpose of the original act that the General Assembly in 1907 intended Article 5 to govern electric power infrastructure. It has never expanded that legislative purpose to include transportation of petroleum.

¶ 22 We therefore conclude that section 38–5–105 does not clearly imply condemnation authority for a company to construct a petroleum pipeline. Because the General Assembly did not give such authority expressly or by clear implication, Sinclair does not have the power of eminent domain under section 105 to condemn the landowners' property for construction of its petroleum pipeline.

¶ 23 We also granted certiorari to address additional contentions of error by the trial court at the immediate possession hearing and at the hearing to determine the value of the land. We need not address these other contentions, however, because we have determined that Sinclair did not have the power of eminent domain and was therefore not entitled to immediate possession of the property.

### III. Conclusion

¶ 24 By enacting section 38–5–105, the General Assembly did not grant, either expressly or by clear implication, the power of eminent domain to companies for the construction of pipelines conveying petroleum. Accordingly, Sinclair does not have condemnation authority in this case for the construction of its petroleum pipeline. We therefore reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

Justice HOBBS dissents, and Chief Justice BENDER joins in the dissent.

Justice EID dissents.

---

**3.** "Gas," as used in this statute refers to natural gas, not gasoline. *See, e.g., Jilot v. State,* 944

P.2d 566, 570 (Colo.App.1996).

Justice HOBBS, dissenting.

¶ 25 The General Assembly has clearly and explicitly provided for a right of eminent domain for pipeline companies, including companies transporting petroleum products by pipeline. The circumstances surrounding the General Assembly's provision bolster this conclusion. Accordingly, I respectfully dissent.

## I.

¶ 26 The principal question in this case turns on whether Sinclair Transportation Company (Sinclair) is a "pipeline company" within the meaning of section 38–5–105, C.R.S. (2011). The theory of Petitioners ("Landowners") is that the statute extends eminent domain powers not to all pipeline companies but only to "electric pipeline companies." I disagree. In my view, the legislature has plainly provided that a pipeline company, such as Sinclair, may condemn a right-of-way to transport any resource by pipeline.

¶ 27 While the pipeline in this case would transport "refined petroleum motor fuels," *Sinclair Transp. Co. v. Sandberg,* 228 P.3d 198, 202 (Colo.App.2009), the Majority implicitly acknowledges that there is no material legal distinction between these fuels and crude petroleum. *See, e.g.,* maj. op. at ¶ 10 ("We disagree because section 38–5–105 does not expressly define a pipeline company as a company conveying petroleum....."). The historical record amply demonstrates that the General Assembly's intent in enacting the "pipeline company" portion of section 38–5–105 had a great deal to do with regulation of petroleum pipelines. The purpose of our General Assembly, like several states' legislatures beforehand, was to give independent oil producers a chance to compete by countering the anticompetitive tendencies of large petroleum conglomerates operating under the umbrella of the Standard Oil Company monopoly. Our legislature's use of the words "pipe line company" in its 1907 enactment occurred amidst a Colorado oil boom at the very height of a populist movement countering Standard Oil's dominance.

¶ 28 Prior to the 1907 act, the General Assembly had already defined pipeline companies as conveying "gas, water, or oil." It reinforced this definition in 1907 with more comprehensive language on pipeline companies, not limited to "electric pipeline companies," as possessing the eminent domain power. Petroleum was the main target of the 1907 act.

### A. Standard of Review

¶ 29 The proper construction of a statute is a matter of law we review de novo. *Boulder Cnty. Bd. of Comm'rs v. HealthSouth Corp.,* 246 P.3d 948, 951 (Colo.2011). Our role is to effectuate the intent of the General Assembly. *Id.* First we look to the plain language of the statute and assign it its commonly accepted meaning. *Id.* If the language is ambiguous, we employ other aids of statutory construction, including the history of the statute and prior statutes on the same subject, and the circumstances surrounding the act. *Leonard v. McMorris,* 63 P.3d 323, 336–37 (Colo.2003); *City of Ouray v. Olin,* 761 P.2d 784, 788 (Colo.1988). We avoid constructions that would render words of the statute superfluous or yield illogical or absurd results. *People v. Null,* 233 P.3d 670, 679 (Colo.2010). In employing these aids, we are mindful that a condemnation statute must grant condemnation power expressly or by clear implication, not by doubtful implication. *Coquina Oil Corp. v. Harry Kourlis Ranch,* 643 P.2d 519, 522 (Colo.1982).

### B. Section 38–5–105 Clearly Grants Pipeline Companies Eminent Domain Power

¶ 30 Section 38–5–105 states:

Such telegraph, telephone, electric light power, gas, or *pipeline company* or such city or town is vested with the power of eminent domain, and authorized to proceed to obtain rights-of-way for poles, wires, pipes, regulator stations, substations, and systems for such purposes by means thereof.

(Emphasis added.)

¶ 31 No grammatical acrobatics are necessary to discern the subject of this sentence. It is a basic list of adjectives (and one adjectival phrase) modifying "company," specifying the types of companies vested with the

eminent domain power. The sentence is no less clear than, for example, "Red, blue, and green shirts are on sale now." Those business entities vested by section 38–5–105 with eminent domain power are telegraph companies, telephone companies, electric light power companies, gas companies, and pipeline companies.

¶ 32 The "Such" beginning the sentence harkens back to the subjects of sections 38–5–101 and –102. Those sections vest power in "[a]ny domestic or foreign electric light power, gas, or pipeline company." §§ 38–5–101, –102, C.R.S. (2011). This compound subject is equally as clear as section 38–5–105, obviously vesting power in electric light power companies, gas companies, and pipeline companies. Nothing in sections 38–5–101 and –102 purports to limit the type of "pipeline company" granted power by section 38–5–105.

¶ 33 Neither the Majority nor the Landowners argues that Sinclair is not a pipeline company. In my view, under the plain language of the statute, Sinclair has the power to condemn an easement on Landowners' land as a right-of-way for their pipeline.

¶ 34 While I believe the statute is clear, I also believe that, if the statute might be viewed as ambiguous, our statutory construction aids reveal that the General Assembly intended the statute to encompass petroleum pipeline companies. The statutes leading to 1907 illuminate a straightline path to the General Assembly's inclusion of pipelines such as Sinclair's.

### C. Legislative History of Section 38–5–105

¶ 35 The General Assembly enacted the forerunner to section 38–5–105 in 1885. That act made no reference to gas or pipeline companies but provided in its section 4 for eminent domain authority in certain types of companies:

> That whenever *such telegraph, telephone or electric light company* shall fail, on application thereof, to secure, by contract or agreement, such right of way for the purposes aforesaid, over the lands, privileges or easements of another person or corporation, it shall be lawful for *such*

*telegraph, telephone or electric light company* to acquire such title in the manner provided by law, for the exercise of the right of eminent domain.

Sec. 4, 1885 Colo. Sess. Laws 358 (emphasis added).

¶ 36 This act began the structure, surviving today in section 38–5–105, of using "such" at the beginning of successive sections of statute in describing the types of company possessing the eminent domain power. Section 1 of the act begins, "[a]ny telegraph, telephone or electric light company." *Id.* Sections 2 and 3 follow, beginning with "[t]hat such telegraph, telephone or electric light company." *Id.* The legislature was abundantly clear what it meant, then, in section 4's subject, "such telegraph, telephone or electric light company." The grammar of this phraseology has three adjectives—"telegraph," "telephone," and "electric light"—modifying the noun "company."

¶ 37 The General Assembly first granted the condemnation power to petroleum product pipelines in 1891, through a reference to the corporate code, Chapter XIX at the time, expressly identifying the term "pipe line company":

> Whenever any three or more persons associate under the provisions of said Chapter XIX, of the General Statutes of the State of Colorado, to form *a company, for the purpose of constructing a pipe line for the conveyance of gas, water or oil,* they shall in their certificate, in addition to the matters required in Sec. 2 (two) of said Chapter XIX, specify as follows: The places from and to which it is intended to construct the proposed line or lines, and any *pipe line company* formed under the provisions of said Chapter XIX, shall have the right of way over the line or lines named in the certificate, and shall also have the *right to convey gas, water or oil* by said lines as stated in such certificate, through lands of the State of Colorado, and lands of individuals with the right to erect thereon pump stations, storage tanks, and other buildings necessary for such businesses, and if any such corporation shall be unable to agree with such individuals owning any of such

lands for the purchase of any real estate required for the purpose of any such corporation or company, or the transaction of the business of the same, or for right of way, or any other lawful purpose connected with or necessary to the operation of said company, *such corporation may acquire such title in manner provided by law.*

Sec. 1, 1891 Colo. Sess. Laws 94 (emphasis added).

¶ 38 This statute modifies the term "pipe line company," the purpose of which is "constructing a pipe line for the conveyance of gas, water or oil." This implies that, when the General Assembly later enacted laws affecting any "pipe line company," it meant those companies transporting gas, water, and oil. *City & County of Denver v. Rinker*, 148 Colo. 441, 446, 366 P.2d 548, 550 (1961) ("[T]here is a presumption that all laws are passed with knowledge of those already existing. . . ."). Furthermore, while the General Assembly, in 1891 at least, saw no need to grant eminent domain powers to "electric pipeline" companies, it did consider commonly understood pipeline companies—those carrying oil, gas, and water—to be a distinct type of business meriting eminent domain power.

¶ 39 The General Assembly updated the 1885 act in 1907, repealing the earlier act and replacing it with new, albeit very similar, language. Ch. 175, sec. 9, 1907 Colo. Sess. Laws 388. Section 1 of the new act gave "[a]ny telegraph, telephone, electric light or power *or pipe line company* chartered or incorporated under the laws of this state . . . the right to construct, maintain and operate lines of telegraph, telephone, electric light, wire or power *or pipe line* along, across, upon and under any public highway in this state." Ch. 175, sec. 1, 1907 Colo. Sess. Laws 385 (emphasis added). Section 2 gave the same companies the same rights over state lands; section 3 gave the companies the rights to contract for these purposes; and section 4 gave the companies slightly broader rights over the land of private individuals and corporations, including the "right to erect its poles, wires, pipes, system and offices" thereon. Ch. 175, secs. 1–4, 1907 Colo.

Sess. Laws 385–86. Section 4 also provided an exception over railroad land. Ch. 175, sec. 4, 1907 Colo. Sess. Laws 386. While it authorized "any necessary easement or easements to cross" railroad land, this right apparently was not broad enough to encompass the full "system and offices" envisioned as meriting eminent domain for other private land. *Id.* Further along in this discussion, I explain the relevance of the railroad-specific language.

¶ 40 Section 4 of 1885 became section 5 of the 1907 act, which read in material part:
That such telegraph, telephone, electric light power or pipe line company is hereby vested with the power of eminent domain, and authorized to proceed to obtain rights of way for poles, wires, pipes and systems for the purposes aforesaid by means thereof. . . .

¶ 41 Ch. 175, sec. 5, 1907 Colo. Sess. Laws 386. This section's amendments to the 1885 law were therefore threefold: (1) to change "electric light" to "electric light power," (2) to add "pipe line" to the list of types of companies included, and (3) to specify that the rights of way were to be for "poles, wires, pipes and systems" authorized in the prior four sections.

¶ 42 From this point on, purely as a textual matter, "pipe line company" in section 5 must have meant some other kind of company than one constructing, maintaining, or operating "pipe lines" of telecommunication or electrical wire. The 1907 language independently gave telecommunication and electric companies rights of way to erect "wires" and "pipes." *Id.* If, as the Majority asserts, electrical companies needed to run wires through pipes, maj. op. at ¶ 19, the 1907 act gave them the authority to do so independently of the inclusion of "pipe line" companies in the list of companies authorized to exercise eminent domain. Therefore, "pipe line company" must have a meaning separate from "electric light power" companies. To read "pipe line company" as the Majority does is to render the phrase "or pipe line" superfluous, in violation of our canons of construction. *Null*, 233 P.3d at 679. This is an especially serious flaw in the Majority's reasoning, given that the addition of "pipe line" to the list

of types of companies was one of the main amendments the 1907 legislation made to the 1885 law. *City of Colo. Springs v. Powell*, 156 P.3d 461, 465 (Colo.2007) ("[W]e presume that by amending the law the legislature has intended to change it."). The Majority would render this change ineffectual, contrary to the intent of the General Assembly.

¶ 43 The use of "such" at the start of section 5 echoes the same start of sections 3 and 4. The reference is clearly to sections 1 and 2, whose subjects are "[a]ny telegraph, telephone, electric light [or] power or pipe line company." Ch. 175, secs. 1–5, 1907 Colo. Sess. Laws 385–86 (including the bracketed "or" in section 1 but not section 2). This indicates congruence between the subjects of sections 1, 2, and 5 in 1907, as "such" means "aforementioned." As a result, it is clear that the General Assembly saw no difference between "electric light or power or pipe line company" and "electric light power or pipe line company." *Id.* In other words, following normal syntax, "pipe line company" has always clearly been distinct from electric light and power companies.

¶ 44 Finally, the legislature extended the eminent domain power to foreign companies in 1939 and to gas companies and municipalities in 1963. Ch. 104, secs. 1–2, 1939 Colo. Sess. Laws 365; ch. 120, secs. 1–7, §§ 50–5–1 to –8, 1963 Colo. Sess. Laws 479–82. These acts removed the aberrant "or" in the 1907 act's reference to "electric light or power *or* pipe line company," in my view confirming that the "or" never had any meaning with respect to pipeline companies.

### D. Oil Pipeline Development in the United States

¶ 45 The circumstances surrounding our legislature's enactment are compelling. The first key to understanding the development of oil pipelines in the United States is to understand their dynamic relationship with the railroads. When oil was first discovered, in Pennsylvania in 1859, "there were but two ways of moving it out of the area—boats and wagons." Arthur Menzies Johnson, *The Development of American Petroleum Pipelines: A Study in Private Enterprise and Public Policy, 1862–1906*, at 2 (1956).[1] As early as 1860, entrepreneurs contemplated building pipelines to transport oil to railroad depots, a vast improvement over the wagons and boats. Once pipeline construction began, they spurred competition between railroads. But "[e]ventually the economies of pipeline transportation resulted in 'trunk' pipelines displacing the railroads as the main transporters of crude oil on long hauls. In short, pipelines developed from feeders into rivals of the railroads for the crude oil traffic." *Id.*

¶ 46 Eminent domain for oil pipeline companies developed in the second decade of oil production, when the function of pipelines was to bring the oil to the railroads for transportation. The eminent domain concept developed in reaction to an anticompetitive scheme hatched in 1872 by stockholders of the South Improvement Company, including John D. Rockefeller. The scheme would have minimized competition among railroads for oil traffic by allocating to each member railroad a fixed share of the traffic, and would have favored member refineries in freight rates. *Id.* at 18. Rockefeller was adept at securing such favors for his Cleveland oil refineries (organized into the enormous Standard Oil Company in 1870), and already had such an agreement with the Lake Shore Railroad. *Id.* at 15–16. But when a Lake Shore official implemented the South Improvement Company scheme rates prematurely, "oilmen from Oil Creek to New York harbor exploded in indignation." *Id.* at 19.

¶ 47 When these angry independent producers and refiners met to consider how to respond, they entertained proposals ranging

---

1. Johnson elaborates:

    Oil had to be brought from the wells to the railroads, and initially the only means at hand was the horse-drawn wagon. This method of oil transportation at its peak employed six thousand two-horse teams. A correspondent of the Philadelphia *Press* in 1863 found 1,800 such vehicles serving Titusville from the oil wells. In July, 1865, two thousand teams were counted passing over the Franklin Street Bridge in Titusville in one day. The cost in horses, lost oil, and profanity, as these teams, loaded with five to seven barrels weighing 360 pounds each, lumbered through the mud of the oil farms, was staggering.

    *Id.* at 4 (citations omitted).

from constructing a pipeline from the oil-producing regions all the way to Erie, Pennsylvania, to a general strike. *Id.* Ultimately, they boycotted the South Improvement combination, requested a congressional investigation, and "insisted on the passage of a pipeline bill granting them the right of eminent domain." *Id.* at 20. Understanding that control of pipelines would have been essential to the South Improvement scheme for access to oil supplies, the oilmen intended the eminent domain measure to "facilitate pipeline access to competing rail lines and water transportation." *Id.* Within weeks, the measure passed the Pennsylvania legislature, and the first "free pipe bill" became law. *Id.*

¶ 48 Just one month later, the Ohio legislature followed suit, granting pipelines eminent domain so long as they acted as common carriers. *Id.* at 24. The *Cleveland Leader* newspaper, supporting the law, explained its purpose as facilitating a trunk pipeline connecting the Cleveland refineries with the oil-producing regions, bringing about "the end of all monopolies, all warring with eastern corporations for just rates and all danger of defeat at the hands of our rivals." *Id.*

¶ 49 Events of 1874 highlighted the importance of these free pipe laws. The Columbia Conduit oil pipeline attempted to use the Pennsylvania free pipe law to cross a branch line of the Pennsylvania Railroad, putting up a bond to cover just compensation. The railroad refused the bond, despite a court order that it was legal, and "tore up the pipes laid by the Conduit." *Id.* at 35. In a similar dispute, a court enjoined the Columbia Conduit from crossing the tracks of a station of the West Penn Railroad. *Id.*

¶ 50 The next key development was the construction of an independent trunk pipeline from Pennsylvania's oil regions to the coast. Called the Tide–Water Pipeline, its officers communicated by cipher to throw Standard Oil off track as to its planned location. *Id.* at 75. Where it crossed a branch line of the Pennsylvania Railroad, the railroad tore it

up. *Id.* The pipeline won the case, but at the cost of delay. The line was completed in 1879, a transformative event which "sealed the doom of the railroads as primary crude oil carriers." *Id.* at 100 (internal quotation marks omitted). Standard Oil responded by constructing its own, vast, trunk pipeline system. Independent parties responded in turn with another pipeline, in 1880, from the oil regions to three independent refineries in Buffalo. Again, this pipeline was delayed when the Erie Railroad opposed its right-of-way over the Erie's tracks—ultimately, the pipeline won in litigation, under the New York free pipe law. "The cause of the railroad's opposition soon became apparent, for the pipeline's competition forced railroad oil freight rates down." *Id.* at 103.

¶ 51 Needing a stronger weapon against Standard Oil, the Pennsylvania legislature significantly strengthened the eminent domain power in its free pipe law of 1883. *Id.* at 118–19. Echoing other papers, the *Pittsburgh Daily Dispatch* called this the end of the "struggle against the monopoly of the oil trade by the Standard, which ... was upheld by the refusal of the Legislature, year after year, to put the pipe line business on a footing which gave a fair chance to competition." *Id.* at 119.

¶ 52 This was no overstatement of Standard Oil's power in the marketplace, even after independent pipelines began pumping. In subsequent litigation dissolving the Standard Oil Trust, the company did not deny that between 1870 and 1882 it "had obtained a complete mastery over the Oil industry, controlling 90 per cent of the business of producing, shipping, refining, and selling petroleum and its products, and thus was able to fix the price of crude and refined petroleum, and to restrain and monopolize all interstate commerce in those products." *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 33, 44, 31 S.Ct. 502, 55 L.Ed. 619 (1911).[2]

---

**2.** The Court noted that Standard Oil, "whilst admitting many of the alleged acquisitions of property," denied allegations of its intent to monopolize the oil trade. *Standard Oil Co.,* 221 U.S. at 44, 31 S.Ct. 502. The Court, however,

found the requisite intent, affirming the district court. *Id.* at 77, 31 S.Ct. 502.

For a sense of Standard Oil's power at its height, consider that Esso (renamed Exxon), Mobil, Chevron, Amoco, and Conoco were just some

¶ 53 States tightened pipeline regulation in the following years, without substantial impact on the Standard Oil pipeline monopoly. Standard "absorbed all pipelines of any significance," and neutralized competition with the Tide–Water with an agreement dividing refining and transportation between them. Johnson, *supra*, at 121.[3]

¶ 54 Standard became an issue in the 1888 presidential campaign, with all four major party candidates condemning industrial monopolies. *Id.* at 146. The atmosphere produced no legislative action but did lead to intensive congressional investigations of Standard Oil between 1888 and 1895. Free pipe laws became ever more important as Standard Oil's old enemy, Lewis Emery, Jr., undertook in 1890 to construct the first long-distance refined oil pipeline. *Id.* at 173–74. Organized as the United States Pipe Line Company, it overcame several disputes with railroads and transported the refined oil from inland refineries to Wilkes–Barre, Pennsylvania, where the Central Railroad of New Jersey would transport it to the sea. One violent encounter with the Lackawanna Railroad, ending in court with a verdict for the railroad, "demonstrated anew that the lack of a free pipe law in New Jersey hampered competition with Standard Oil." *Id.* at 182. The pipeline's reaction was to withdraw from New Jersey, take advantage of the Pennsylvania free pipe law, and extend the line all the way to the Pennsylvania seaboard.

¶ 55 The oil-pipeline theater came much closer to Colorado when the independent oil producers of Kansas erupted against the Standard Oil monopoly in the first years of the twentieth century. After 1900, oil production shifted rapidly away from Pennsylvania, to such a degree that by 1905 more than 60 percent of crude oil came from areas other than where pipeline construction had previously taken place. *Id.* at 211. Standard came into Kansas and erected a pipeline monopoly there as well. When oil prices plummeted, Kansas producers blamed Standard Oil's market power. *Id.* at 212. In early 1905, in a flurry of activity at the Kansas legislature to regulate oil pipelines, "[i]n the space of a few months Kansas producers had obtained all the legislation that their Pennsylvania counterparts had striven for decades to obtain." *Id.* at 215.

¶ 56 The Kansas episode finally prompted action at the U.S. Congress, with the encouragement of President Theodore Roosevelt. In 1906, as an amendment to the Hepburn Act (whose main purpose was to regulate railroad rates), Congress mandated the regulation of pipelines as common carriers by the Interstate Commerce Commission, whose primary purpose had been to regulate the railroads themselves as such.

¶ 57 It was the very next year that the Colorado General Assembly passed its own free pipe law, apparently as a reaction to the events in Kansas and as an attempt to support the price of crude oil for Colorado producers. It is unimaginable that an act of 1907 adding "pipe line" companies to a list of entities empowered with eminent domain could possibly be construed to exclude oil pipeline companies at the zenith of their regulation nationwide.

### E.  Oil in Colorado

¶ 58 Colorado's entrance into the Union began with a series of natural resource booms, first in gold, then in silver, then in coal. But overall, our "openness to any new scheme, especially to any new scheme for making money, has meant Coloradans have used their land hard. From the beginnings of Anglo–American activity, Colorado was a resource frontier that invited exploitation. . . . The result has been a Colorado economy dominated by the cycle of local booms." Carl Abbott et al., *Colorado: A History of the Centennial State* 357 (3d. ed. 1994). From the beginning, our General Assembly facilitated this exploitation with legislation. Oil was no different, despite originally comprising a relatively small business compared with other natural resources.

---

of the spinoff companies created when regulators successfully broke it up.

**3.** Standard got 88.5 percent of traffic to the Tide–Water's 11.5 percent, and they agreed to maintain the same rates.

¶ 59 Petroleum was first discovered in Colorado in 1860, near Cañon City. Lee Scamehorn, *High Altitude Energy: A History of Fossil Fuels in Colorado* 43 (2002). The first big well started producing in Florence in 1883, prompting a 200–barrel–per–day refinery there in 1885. The Colorado Oil Trust consolidated the principal enterprises at Florence into a single corporation in the late 1880s. An 1888 agreement gave the Continental Oil Company—an arm of Standard Oil, now renamed Conoco—power over marketing the Colorado Oil Trust's entire output, thereby substantially bringing Colorado's output under the control of the Standard Oil monopoly. *Id.* at 48. As independent oil refiners popped up, Continental repeatedly slashed prices to drive them out of business. *Id.* at 49–50. The Rocky Mountain Oil Company, for example, was forced to close and sell off its 28–mile pipeline from the oil field to its refinery.

¶ 60 "For almost two decades, Florence's refineries were the exclusive source of petroleum products for the states and territories of the intermountain West." *Id.* at 50. Production boomed from 100,000 barrels in 1887 to 824,000 barrels in 1892. *Id.* at 51. The Florence fields' dominance subsided somewhat as Boulder-area fields opened, with the first large well completed in 1902. *Id.* at 54. While these new fields reached only 48,952 barrels of output by 1906, they were economically important for their superior quality, the finest that had been found west of the Mississippi. *Id.* at 56.

¶ 61 It was in this milieu, the very midst of an enormous oil boom, that the General Assembly enacted its own free pipe law of 1907. Quite clearly, in my view, the legislature understood from Kansas and points east the threat Standard Oil posed to local oil prices, and took action to sustain Colorado's independent producers and refiners. Since as early as 1872, statewide free pipe laws were used as important weapons against Standard Oil's pricing schemes. The General Assembly already had enacted the beginnings of a free pipe law in 1891, as production boomed in Florence and Standard Oil moved swiftly into the state. But by 1907, as Kansans protested Standard's influence over prices

and congressional investigations revealed Standard's excesses, the General Assembly ostensibly felt it needed to strengthen the law. Moving outside the corporations code, the legislature specifically added "pipe line" companies to the eminent domain statute it first enacted in 1885. The language and the message were absolutely clear that pipelines—not only including but *especially* oil product pipelines—henceforth could exercise eminent domain powers. The condemnation powers would not only be over private and governmental landowners, but specifically over railroad-owned land, a provision of paramount importance in the battles between the railroads and their primary foes of the age: not pipelines carrying electricity, but those carrying oil.

### F. Further Response to the Majority's Reasoning

¶ 62 The Majority opinion, arguing that section 38–5–105 contains no "clear implication" that the legislature granted the power to petroleum pipeline companies, is not persuasive. *See Coquina Oil Corp.,* 643 P.2d at 522.

¶ 63 After rejecting the well-reasoned court of appeals opinion for its use of cases from other jurisdictions (just one of many lines of reasoning that court provided for its holding), maj. op. at ¶¶ 10, 18, the Majority begins its own analysis. It begins by noting that "[r]eading Article 5 as a whole, the words 'such … company' in section 105 mean companies described in sections 38–5–101 and –102." *Id.* at ¶ 12. This is correct, but then the Majority takes an illogical step: "Just as 'such … companies' [in section 38–5–105] is more completely described in sections 101 and 102, we also look to those two sections for the meaning of the phrase 'such purposes' in section 105." *Id.* at ¶ 13.

¶ 64 The Majority here is referring to that part of section 105 which allows "rights-of-way for poles, wires, pipes, regulator stations, substations, and systems *for such purposes* " (emphasis added). Sections 101 and 102 grant the companies the right "to construct, maintain, and operate lines of electric light[,] wire or power or pipeline." The bracketed comma is present in section 101

but absent from 102. The Majority believes this comma, deep within sections 101 and 102, is enough to render "pipeline company" in section 105 ambiguous. *Id.* at ¶ 15.

¶ 65 Apparently the perceived ambiguity arises from whether "electric" modifies "pipeline" in the Majority's selected phrase in section 101 and section 102. *Id.* The Majority concludes that it must. *Id.* at ¶ 19. The Majority therefore selects a reading of sections 101 and 102 that gives "pipeline companies" eminent domain power (under section 105) only if they are "electric pipelines." The Majority concludes that "pipeline" is therefore limited to "pipes involved in delivering electric power through the power grid, such as those pipes encasing underground electric wiring." *Id.*

¶ 66 This reading has several fatal flaws. First, section 105 quite clearly gives eminent domain power to "gas" companies for "wires, pipes, regulator stations, substations, [etc.]." With this language, the legislature very clearly authorized gas pipelines in section 105. Yet the Majority opinion, in constricting the section 105 eminent domain power to "electric pipelines," ignores the reality of these gas pipelines.

¶ 67 Second, the legislature had no need to enumerate "electric pipelines" as independently empowered to condemn rights-of-way, because section 105 very clearly grants electric light power companies this power for their "pipes" and "wires." Additionally, however, the legislature gave the condemnation power to "pipeline" companies as distinct from "electric light companies." Since any "electric pipeline company" would certainly also be considered (more simply) an electric company, the Majority's interpretation renders the term "pipeline company" superfluous.

¶ 68 Third, the whole "electric pipeline" argument depends on the premise that "such purposes" in section 105 is an implicit cross-reference back several sections to the Majority's selected phrase in sections 101 and 102—i.e. the phrase involving the right "to

construct, maintain, and operate lines of electric light[,] wire or power or pipeline." There are several phrases in between these sections which could in theory constitute the "purposes." But, in my view, the "such purposes" phrase in section 105, which the Majority finds so ambiguous, speaks for itself: the companies can obtain easements "for poles, wires, pipes, regulator stations, substations, and *systems for such purposes.*" (emphasis added). "[T]he general rule of statutory construction is that relative and qualifying words and phrases, where no contrary intention appears, are construed to refer solely to the last antecedent with which they are closely connected." *People v. McPherson,* 200 Colo. 429, 432, 619 P.2d 38, 40 (1980). Both this general rule of construction and a plain reading of the statute yield the same conclusion: "for such purposes" modifies "systems" and not some other phrase the Majority selected from three or four sections earlier.[4] In cross-referencing back to sections 101 and 102, the Majority ignores the "purposes" of the easement which are right before its eyes: "poles, wires, pipes, regulator stations, [and] substations." § 38–5–105.

¶ 69 Fourth, the legislature varied its comma use several times in the 1907 statute, probably under the widely recognized, contemporary theory that "punctuation will not be given much consideration in interpretation because it often represents the stylistic preferences of the printer or proofreader instead of the considered judgment of the drafter or legislator." 1A Sutherland Statutory Construction § 21:15 (7th ed., West 2011); *see Hammock v. Farmers' Loan & Trust Co.,* 105 U.S. 77, 84, 26 L.Ed. 1111 (1881) ("Punctuation is no part of the statute."); *Ewing's Lessee v. Burnet,* 36 U.S. 41, 54, 11 Pet. 41, 9 L.Ed. 624 (1837) ("Punctuation is a most fallible standard by which to interpret a writing. . . ."). At the very least, it was the rule that punctuation "should never be allowed to overturn what seems to be the plain meaning of the instrument, yet when it is so used as to

---

**4.** Also, were "for such purposes" not considered to modify "systems," "systems" might be a large enough word to authorize an electric company to mine coal or pump oil on these easements, for example, or to construct power plants. So the legislature limited the easements to the land needed to operate and maintain lines of communication, transmission or transportation.

enable the language to bear an interpretation which will make the whole instrument rational and self-consistent it is entitled to consideration as much as the language itself." *Blood v. Beal*, 100 Me. 30, 60 A. 427, 430 (1905). The Majority, by contrast, exploits the statute's inconsistent punctuation to create an ambiguity that is not there. However, the clear intent of the legislature, in my view, was to add to preexisting law pipeline companies carrying something other than electrical power or telecommunication.

¶ 70 The Majority then seeks to cast doubt on the meaning of the 1907 act by citing subsequently enacted eminent domain legislation. Maj. op. at ¶ 17. "If we were to read section 38–5–105 as granting condemnation power to any pipeline company," its reasoning goes, these later grants of authority "would be superfluous." *Id.* One of these statutes grants authority to companies organized to conduct or maintain "power, water, air, or gas" pipelines. § 38–4–102, C.R.S. (2011); ch. 125, sec. 2, 1907 Colo. Sess. Laws 283.[5] Another statute, passed in 1917, gives pipelines "for transporting water or air," along with ditches, flumes, trams, tramways,

and pack trails, the right of eminent domain for rights of way specifically over mining claims. § 34–48–105, C.R.S. (2011); ch. 97, sec. 1, 1917 Colo. Sess. Laws 378.

¶ 71 The fact that these other statutes cover pipelines, but not oil pipelines, does not cast doubt on the history showing that section 38–5–105 does cover oil pipelines. The General Assembly has passed more than one hundred condemnation statutes, each with a slightly different focus, which often overlap. *See* § 38–1–202, C.R.S. (2011) (listing eminent domain statutes). Evidently its intent in doing so was to create as much certainty as possible that the courts would respect different aspects of different entities' eminent domain power. While we must of course construe ambiguous eminent domain statutes narrowly, it defeats the intent of the General Assembly to read one condemnation statute, with one subject matter and purpose, to implicitly narrow an overlapping earlier act with a slightly different subject matter and purpose.[6] The fact that overlapping condemnation statutes exist does not render any of the overlapping statutes superfluous or command any particular interpretation.[7]

---

5. While this statute was passed in 1907, it came later in the session than the 1907 act discussed above. *Compare* ch. 125, 1907 Colo. Sess. Laws 286, *with* ch. 175, 1907 Colo. Sess. Laws 388.

6. Section 38–4–102 deals with foreign and domestic "corporation[s]" organized to "conduct[ ] or maintain[ ]" a pipeline "for the transmission of power, water, air, or gas." Section 34–48–105 deals with any "person or corporation" desiring to "construct, maintain, or operate" a "pipeline for transporting water or air for mining purposes." Section 38–5–105 involves any "pipeline company authorized to do business under the laws of this state." § 38–5–101. The scopes of these statutes are all similar, but slightly different. Despite their considerable overlap, none of these statutes negates any of the others, either explicitly or implicitly. The Majority does not argue, for example, that the scope of section 34–48–105, involving only "water or air," somehow could implicitly limit section 38–4–102's scope of "power, water, air, or gas." Neither does either later statute impliedly limit section 38–5–105.

7. The United States Supreme Court agrees, and has rejected the faulty reasoning the Majority now employs, holding that overlapping statutes need not be interpreted narrowly to avoid one of the statutes being rendered superfluous. The case involved whether the federal courts of ap-

peals had jurisdiction over interlocutory appeals from a bankruptcy court. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 251–52, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). General jurisdiction statutes granted the courts of appeals interlocutory jurisdiction, while a specific bankruptcy jurisdiction statute gave the courts of appeals jurisdiction over appeals from final judgments without mentioning their role in interlocutory appeals. The party opposing jurisdiction in the case argued that, in order to avoid the specific statute being rendered superfluous, the general statutes must be interpreted as limited to non-bankruptcy cases and not to provide blanket interlocutory bankruptcy jurisdiction. *Id.* at 252–53, 112 S.Ct. 1146. This is the same form as the Majority's argument: that the rule against superfluity refutes an interpretation that statutes simply overlap in function, and demands that the more expansive statute be read narrowly. Maj. op. at ¶ 17.

But, the U.S. Supreme Court disagreed with the argument, holding that the statutes "do overlap." *Germain*, 503 U.S. at 253, 112 S.Ct. 1146. This was no problem: "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Id.* (internal citation omitted). "While courts should disfavor interpretations of statutes that render language superfluous, *in this case*

¶ 72 Furthermore, the Majority's stance—that later statutes authorizing air, water, power, and gas pipelines would be superfluous if the 1907 act at issue authorized anything more than "electric light power pipelines"—is self-defeating. The later acts reauthorized eminent domain for "power" pipelines, which presumably are the same things as "electric light power pipelines" or "electric pipelines." Under the Majority's logic, since such right of way condemnation was already authorized, the later "limited grants of authority" would be superfluous with regard to such pipelines. The Majority's argument collapses from its own weight. It cannot disprove that the 1907 act and the current section 38–5–105 clearly gave eminent domain to more than just electrical pipelines, and especially to oil pipelines.

¶ 73 To begin its next argument, the Majority notes that "sections 101 and 102 grant condemnation power not only to the enumerated companies, but also to 'any city or town owning electric power producing or distribution facilities.'" Maj. op. at ¶ 19. This is true. But then the Majority makes an unjustifiable leap: "It appears from this language that the General Assembly intended to grant condemnation authority to municipal bodies only in connection with electric power infrastructure. We perceive no reason why the General Assembly would grant private companies much broader condemnation authority than it granted municipal bodies under the same statutory scheme." *Id.* A likely

reason is that cities do have considerable, overlapping condemnation authority under other statutes. *See* § 38–1–202(1)(e). But in any case, this is a policy judgment well within the authority of the legislature.

¶ 74 The Majority then seeks to derive the meaning of section 105 from section 104(1). This subsection limits companies' condemnation power on railroad land. It provides that such condemnation may not occur "except [1] to the extent of acquiring any necessary easement to cross the same or [2] to serve such railroad company with electric light, power, or gas service." The Majority ignores the first exception but quotes the second. Maj. op. at ¶ 20 (stating incorrectly that there is no right of way on railroad land " 'except ... to serve such railroad company with electric light, power, or gas service' "). From this the Majority concludes that section 104 "contemplates that these 'pipeline companies' would be engaged in the conveyance of electric power or natural gas through their pipelines, not petroleum." *Id.*

¶ 75 This conclusion is illogical for two reasons. First, it ignores the possible implications of the very broad first exception. Second, the structure of this part of section 104 is to serve as a railroad-land-specific *limitation* on the broader powers granted in section 105. It does not follow that, because one reason a pipeline can condemn *railroad* land is to serve that land's owner with power or gas, the pipeline can condemn no *other* land except to serve power or gas.[8]

*that canon does not apply." Id.* (emphasis added).

˙ Other courts agree. *See, e.g., United States v. Carona,* 660 F.3d 360, 369 (9th Cir.2011) (rejecting an argument that an interpretation would render a statutory subsection superfluous, reasoning, "It should not be surprising that statutes are not necessarily written so that one and only one statute can apply at a time. To the contrary, statutes often contain overlapping provisions."); *Kienker v. Bauer,* 110 Hawai'i 97, 129 P.3d 1125, 1137 (2006) ("Where two statutes overlap in their application effect can be given to both."); *People v. Rosenbalm,* 354 Ill.Dec. 783, 958 N.E.2d 715, 718 (Ill.App.Ct.2011) (overriding the rule against superfluity because "it is not at all unreasonable to believe that the overlap between these two subsections is simply an oversight by the legislature in enacting one of its many amendments to this statute"); *In re Adoption of N.J.A.C. 7:15–5.24(b),* 420 N.J.Super. 552, 22

A.3d 94, 110–11 (N.J.Super.Ct.App.Div.2011) (holding that one statute did not limit another, and that the rule against superfluity did not apply, because "the Legislature is free to adopt statutes that overlap in subject matter or regulatory authority"); *Royal Food Distribs., Inc. v. Dir., Div. of Taxation,* 15 N.J.Tax 60, 71 (1995) ("While plaintiff is correct in maintaining that a statute should not be construed in a manner that will render any part of a statute inoperative, superfluous, or meaningless, some overlap between statutory provisions is permissible." (internal quotation marks and citations omitted)).

8. Indeed, the Majority (correctly) makes no argument that section 105 applies only to condemnations in order to serve the owner of the land upon which the easement was condemned, even though this is also part of the 104(1) exception it references. This is well, because a fundamental purpose of section 105 is clearly to allow for

¶ 76 A far more credible reading of section 104(1) is that it is an attempt to resolve the widespread and longstanding disputes between railroads and oil pipelines over rights of way, as explained above. The section is designed to allow oil pipelines to cross railroad land, but only as "necessary"—and not to build any unnecessary "regulator stations, substations, and systems for such purposes," otherwise authorized by section 105 for private land, on railroad land.

¶ 77 The next statutory section to which the Majority turns for illumination is section 38–5–107. There, the Majority explains, the legislature included "detailed provisions concerning high voltage electric power transmission, including discussion of 'overhead or underneath construction.'" Maj. op. at ¶ 20. This appears to be related to public safety specifically regarding electric power lines, but the Majority takes it to "support the determination that the statute as a whole concerns electric power infrastructure and does not govern transportation of petroleum." *Id.* This conclusion is belied by the clear fact that the statute as a whole concerns more than electric power infrastructure, including telecommunications and gas infrastructure as well as the "pipeline" infrastructure at issue in this case.

¶ 78 Finally, the Majority attempts to support its flawed conclusion—that the statute as a whole concerns only electric power infrastructure to the exclusion of unnamed types of pipeline—with an examination of the legislative statement prefacing the act in 1907. According to the statement, the act's purpose was "to facilitate the construction of telegraph, telephone, electric light power and pipe lines ... including ... *for the transmission of electric or other power.*" *Id.* at ¶ 21 (emphasis in original). This statement has never been codified, and the legislature, though it has amended the act numerous times, has never undertaken to include in any amendment a new purpose statement. *Id.* From the 1907 statement the Majority infers that the legislature "has never expanded the legislative purpose to include the transporta-

tion of petroleum." *Id.* Nor of gas, it is notable. Nor does the clause the Majority underlines include telegraph or telephone service. The highlighted words comprise a clause in a purpose statement preceded by "including," a word which does not preclude those things which do not follow it.[9] The far more telling part of the purpose statement, to the extent it is still meaningful at all, is that it declares the legislature's intent to facilitate the construction of "pipe lines."

¶ 79 In sum, not one of the Majority's many arguments is persuasive that "pipeline companies" in section 38–5–105 do not include oil pipeline companies. To the contrary, the plain language of the statute and its legislative and political history compel the conclusion that the statute does grant oil pipeline companies eminent domain power. Pipelines are linear projects that necessarily involve condemnation when the threshold attempt to negotiate agreements with intervening landowners is unavailing. Odd angle turns to avoid non-consenting landowners can make conveyance of the raw material or product impossible, infeasible, and/or extraordinarily expensive. Consequently, the General Assembly intended the condemnation authority to be available to any pipeline company, upon payment of just compensation when consent of an intervening landowner cannot be obtained.

### II.

¶ 80 I would hold pipeline companies to have eminent domain power for rights-of-way, and proceed to the further issues in this case. Accordingly, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE BENDER joins in this dissent.

Justice EID, dissenting.

¶ 81 For a number of reasons identified by Justice Hobbs, I dissent from the majority's opinion. *See Larson v. Sinclair Transp. Co.,* No. 09SC966, 2012 CO 36, 284 P.3d 42 (Hobbs, J., dissenting). I write separately to

rights-of-way through land to serve others residing beyond it.

9. Were we to hold that "including" is preclusive, and apply the Majority's logic, we would also have to hold section 105 not to apply to gas or telecommunications lines.

express my view that the language of section 38-5-105 cannot be read as the majority reads it. Because, in my view, respondent is a "pipeline company" falling squarely within the language of section 38-5-105, I would affirm the court of appeals on that ground. *See City of Colo. Springs v. Powell,* 156 P.3d 461, 468 (Colo.2007) (Eid, J., concurring in part and specially concurring in part) (urging that the case be decided on plain language grounds alone).

¶ 82 Section 38-5-105 vests eminent domain authority in "[s]uch ... electric light power, gas, *or pipeline company* ...." (Emphasis added.) The majority interprets "pipeline company" to mean only pipelines associated with providing "electric light power" (or, as it terms it, "electric power infrastructure"). *E.g.* Maj. op. at 45–46. But that interpretation simply cannot be squared with the statutory text. The statutory language at issue here names three kinds of companies—"electric light power" companies, "gas" companies, and "pipeline" companies. In other words, the phrase "electric light power" modifies "company," not "pipeline." "Electric light power" cannot modify "pipeline," as the majority claims, because the phrase is followed by a comma and the words "gas, or," which prevents the implied insertion of "electric light power" before "pipeline." The majority suggests it is unable to "tell whether 'electric light' modifies 'pipeline.'" Maj. op. at 45. A straightforward reading of the language demonstrates that "electric light" does not modify "pipeline."

¶ 83 Petitioners acknowledge the reading they propose, adopted by the majority, is a stretch, and blame the legislature's 1963 amendment to the statute, which, among other things, added the word "gas." The original 1907 language applied to "electric light power or pipe line compan[ies]." Under this original language, petitioners argue, the section applied to "electric light companies," "electric power companies," and "electric pipe line companies." The amendment, however, changed the statutory language to what it is today—that is, to "electric light power, gas, *or pipeline company.*" Petitioners call the 1963 amendment "inartful" and "awkward." Opening Br. at 25. They urge us to

read the term "pipeline" as limited to "electric light pipelines" as it was under their reading of the original language. *But compare Larson,* No. 09SC966, 2012 CO 36, ¶ 72, 284 P.3d 42, 56 (Hobbs, J., dissenting) (reading "pipe line" reference in original 1907 statute to include petroleum pipelines). But as noted above, petitioners' proposed interpretation is flatly inconsistent with the language as amended in 1963. However "inartful" and "awkward" petitioners may feel the language is, it is the language that governs this case.

¶ 84 The majority finds ambiguity in section 38-5-105 by looking to other sections of the statute. Maj. op. at 45. But these other sections do not create ambiguity; instead, they simply reaffirm the plain language reading of section 38-5-105 described above. Indeed, the very sections upon which the majority relies, sections 38-5-101 and -102, repeat the language contained in section 38-5-105 as amended in 1963. See § 38-5-101 (permitting "[a]ny domestic or foreign electric light power, gas, *or pipeline company*" to construct "*pipeline[s]*" "along, across, upon, and under any public highway in this state") (emphasis added); § 38-5-102 (giving "[a]ny domestic or foreign electric light power, gas, *or pipeline company*" the right to construct "*pipeline[s]* and obtain permanent right-of-way therefor over ... public lands") (emphasis added). Those sections permit the "pipeline company" to construct "pipeline[s]" on state highways and to obtain rights-of-way over state land for such construction—powers that parallel the condemnation authority contained in section 38-5-105. The sections in no way limit the meaning of "pipeline" to electric infrastructure, as the majority suggests.

¶ 85 The majority warns that if "pipeline" is not limited to electric infrastructure, the statute "would appear to grant authority to any pipeline company to condemn rights of way for a pipeline conveying *any substance.*" Maj. op. at 45 (emphasis in original). But the majority's concern over a parade of infinite (yet unspecified) horribles is misplaced. As pointed out by the court of appeals in this case, the phrase "pipeline company" has a well-defined meaning in energy law—that is,

a company that uses pipeline to transport petroleum and related products. *Sinclair Transp. Co. v. Sandberg*, 228 P.3d 198, 204 (Colo.App.2009) (citing numerous cases and statutes from other jurisdictions). Here, respondent's proposed pipeline would carry liquid petroleum, and therefore fits comfortably into this definition.[1]

¶ 86 Most importantly, condemnation by "pipeline company[ies]" under section 38–5–105 is further limited by the constitutional public use requirement. *See* Colo. Const. art. II, § 15; *Dep't. of Transp. v. Stapleton*, 97 P.3d 938, 946 (Colo.2004) (Coats, J., concurring in the judgment only) (citing *Buck v. District Court*, 199 Colo. 344, 346, 608 P.2d 350, 351 (1980), for the proposition that legislative grant of condemnation authority is limited by constitutional public use requirement). Thus, the specter posed by the majority—that section 38–5–105 could be applied to any pipeline of any kind for any purpose—is simply not raised in this case.[2]

¶ 87 I agree with the majority that we should not lightly infer the grant of condemnation authority in this, or any, condemnation case. Maj. op. at 45; *cf. Town of Telluride v. San Miguel Valley Corp.*, 185 P.3d 161, 172 (Colo.2008) (Eid, J., dissenting) (urging caution in interpreting extraterritorial condemnation authority held by municipalities). But the fact that condemnation authority should not be lightly inferred does not give the court license to nullify statutory language that grants condemnation authority. Because the majority's interpretation is contrary to the language at issue in this case, I respectfully dissent from its opinion.

---

1. Contrary to the majority's assertion, maj. op. at 45, reliance on caselaw from other jurisdictions to interpret the phrase "pipeline company" is not proof that condemnation authority must be inferred from "doubtful language" in this case, but merely a reflection of the fact that no Colorado court, until now, has taken on this particular interpretative task. *See e.g., Zab, Inc. v. Berenergy Corp.*, 136 P.3d 252, 262 (Eid, J., specially concurring) (noting that caselaw from other jurisdictions can be "instructive" because other courts have interpreted statutory language similar to that adopted in Colorado and have come to a conclusion about its plain meaning).

2. In this case, the issue of whether respondent's proposed condemnation was supported by a public use was considered at length by the court of appeals, which determined that the public use requirement was satisfied. *See Sinclair*, 228 P.3d at 206–07. Because we did not grant certiorari on this issue, the court of appeals' ruling stands; I therefore do not address the issue further.